J-S22017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  A.J.H. AND I.G.H. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.J.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1564 MDA 2016 |

Appeal from the Decree August 23, 2016
In the Court of Common Pleas of Berks County
Orphans' Court at No(s):  84695,
84696

BEFORE:   SHOGAN, MOULTON, and PLATT[*], JJ.

MEMORANDUM BY MOULTON, J.:                **FILED MAY 01, 2017**

Appellant, K.J.R. ("Mother"), appeals from the decrees entered August 23, 2016, in the Berks County Court of Common Pleas granting the petitions of the Berks County Children and Youth Services ("BCCYS") and involuntarily terminating Mother's parental rights to her daughters, A.J.R.-H.,[1] born in March 2007, and I.G.H., born in July 2010 (collectively, "Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[2]  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] At the hearing, A.J.R.-H.'s name was corrected from A.J.H. to A.J.R.-H.  N.T., 8/12/16, at 15.

[2] The parental rights of D.H. ("Father") as to Children also were terminated on the same date by separate decrees.  Father filed a timely
*(Footnote Continued Next Page)*

The trial court summarized the relevant procedural and factual history, in part, as follows:

The family first came to the attention of BCCYS in 2007, the day after A.[J.]R.-H. was born, as the result of a report that alleged a lack of emotional involvement by Father, concerns of Father's abusiveness and alcohol use, and a concern about where the family resided. BCCYS determined the risk to be low and took the report as information only.

A second report, on February 21, 2013, alleged Mother's daily smoking of marijuana and Father's incarceration for domestic violence. The report alleged that Mother suffered from mental health issues and she was not appropriately feeding and supervising the Children. Again, BCCYS determined the risk to be low and took the report as information only.

An intake investigation began on September 23, 2013 upon a third report that alleged Mother and Father were using drugs and that Father had a history of domestic violence and incarceration. Allegations included a 2012 assault by Father on Mother in which he broke her nose and for which he was re-incarcerated. During Father's incarceration, Mother needed assistance with heat for the home, food, diapers, and gas for her car.

The investigation revealed a lengthy history of domestic violence and abuse between Mother and Father. Mother revealed that Father drank beer one or two times per week, but added that he was angry even when sober. Mother did not want to leave Father despite his having broken her nose and on another occasion putting a gun to her head. There were other instances of physical abuse and daily verbal abuse. The Children also reported the abuse and repeated Father's claims that he was going to kill Mother. BCCYS learned that Father failed to complete

*(Footnote Continued)* ————————

appeal in this Court at Docket No. 1606 MDA 2016, which we address by separate memorandum.

counseling and other services and otherwise violated the requirements of his parole on several occasions. Father's abuse of Mother led to parole violations, new charges, and a temporary Protection From Abuse ("PFA") order.

BCCYS filed for dependency of the Children on December 31, 2013. Allegations included histories of domestic violence and drug use by Mother and Father; Mother's needing assistance with heat, food, and diapers; Father's criminal history; and failure to cooperate with offered services.

The hearing on the dependency petition, originally scheduled for February 6, 2014 was continued to February 21, 2014, then April 3, 2014. In the interim, Mother and Father were ordered to cooperate with domestic violence counseling and casework services. Father had supervised visits with the Children, and was not permitted in the family home. There was less than full cooperation with services and prohibition of contact. Mother and Father demonstrated a lack of insight into why BCCYS was involved.

On April 3, 2014, the Court found the Children to be dependent due to severe domestic violence between Mother and Father. Physical custody of the Children remained with Mother. Father was to have no unsupervised contact with the Children. Mother and Father were ordered to participate in services such as domestic violence counseling, drug and alcohol evaluation and treatment, casework services, and establishing and maintaining stable and appropriate housing and income. On August 13, 2014, Father was permitted to have unsupervised contact with the Children, but he remained excluded from the family home until October 14, 2014. During this time, Mother and Father were moderately compliant with the permanency plan.

On November 17, 2014, the Court removed the Children from the home and transferred legal custody to

BCCYS for placement purposes.[3]  The primary goal of return to Mother was established, with a concurrent goal of adoption.  Mother and Father were permitted twice weekly visits with the Children and were ordered to participate in services including parenting education; mental health treatment; domestic violence treatment; drug and alcohol evaluation screening, and treatment; casework services; visitation; and establish and maintain appropriate housing and income.  By Order dated February 11, 2015, Mother's visits were reduced to once per week.

At a permanency review hearing held May 5, 2015, Mother and Father were found to be minimally compliant with services.  Visits with the Children were reduced to bi-weekly.

After a number of continuances, the next review hearing was held February 19, 2016.  Mother and Father were found to have been moderately compliant with the permanency plan, but they made minimal progress toward alleviating the circumstances that led to the Children's placement.  No changes were made in the ordered services. . . .

Trial Court Opinion, 10/25/16, at 4-7 ("1925(a) Op.") (footnotes omitted).

On February 19, 2016, BCCYS filed petitions to terminate parental rights.  On August 12, 2016, the trial court held a hearing on the termination petitions.  In support of its petitions, BCCYS presented the testimony of: Andrea Karlunas, licensed social worker, certified sex offender treatment specialist, and certified domestic violence counselor, who treated Mother and evaluated Children;[4] Nicole Kauffman-Jacoby, BCCYS caseworker; and

---

[3] Children were placed in kinship care with their maternal grandmother and her husband upon removal.

[4] BCCYS presented Ms. Karlunas as an expert.

Sloane Radcliffe, Child Prep worker.[5]  In addition, Mother and Father, who

were both represented by counsel, each testified on their own behalf.  By

decrees entered August 23, 2016, the trial court involuntarily terminated the

parental rights of Mother pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8),

and (b).  On September 12, 2016, Mother, through counsel, filed a timely

notice of appeal, along with a concise statement of errors complained of on

appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[6]

On appeal, Mother raises the following issues for our review:

> A. Whether the trial court erred as a matter of law and
> abused its discretion by admitting the Berks County
> Children and Youth summary packet which included one
> hundred sixty eight (168) exhibits because all exhibits
> were submitted for the truth of the matter asserted
> therein, contained medical/psychiatric opinions and
> diagnosis, and did not fall under any hearsay exception?
>
> B. Whether [BCCYS] failed to prove by clear and
> convincing evidence the elements of 23 [Pa.C.S.] Sections
> [(a)(1), (2), (5), and (8)] because the evidence submitted

_____

[5] The guardian *ad litem* appointed to represent Children argued in favor of termination.  N.T., 8/12/16, at 194-95.

[6] The trial court entered separate decrees terminating Mother's parental rights to Children.  Mother improperly filed only one notice of appeal and one concise statement of errors complained of on appeal from the decrees.  *See* Pa.R.A.P. 341, Note ("Where, however, one or more orders resolves [sic] issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed.").  Because Mother's arguments on appeal are identical as to Children, we discern no prejudice arising from her procedural misstep.  Therefore, we decline to quash or dismiss Mother's appeal.

at the termination hearing was insufficient to prove the statutory requirements of the sections listed above?

C. Whether the trial court erred as a matter of law and abused its discretion by terminating [Mother's] parental rights in that the evidence at the termination hearing failed to show that the needs and welfare of the children are best served by the termination?

Mother's Br. at 5 (unnecessary capitalization removed).[7]

We first address Mother's second and third issues. In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

_____

[7] Although raised in her concise statement, Mother failed to preserve a claim relating to BCCYS' provision of reasonable efforts, as she failed to include this issue in the statement of questions presented section of her brief. *See Krebs v. United Refining Co. of Pennsylvania*, 893 A.2d 776, 797 (Pa.Super. 2006) (stating failure to preserve issues by raising them both in concise statement of errors complained of on appeal and statement of questions involved portion of brief on appeal results in waiver of those issues).

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

As our Supreme Court further explained:

> [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (internal citations omitted). "The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (quoting *In re Diaz*, 669 A.2d 372, 375 (Pa.Super. 1995)). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in

Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998)).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), as well as (b). To affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.,* 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc)*. Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 8 -

. . .

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> [T]o terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)).

Here, in finding sufficient evidence supporting termination of Mother's parental rights, the trial court stated as follows:

Mother has also failed to perform her parental duties. She has apparently allowed herself to believe that since Father has not physically abused the Children they must be safe. She appears to have failed in recognizing that Father's physically abusing her and verbally abusing anyone in the home was and is still an abuse of the Children that caused them to suffer mental and emotional scars. She also failed to recognize the risks, both short- and long-term, of continual exposure of the Children to this abuse and the potential for Father's physically abusive behavior to be turned toward the Children in the future or for the Children to be accidentally harmed whenever they might happen to get caught in the middle. Prior to and during the early stages of BCCYS' involvement, Mother found it easier to stay with Father and expose herself and the Children to his abuse than to leave him. Even in the face of losing custody of the Children, Mother could not find the will to exclude Father from their lives.

Domestic violence counseling has apparently not helped Mother with her insight. Even with the benefit of the counseling that she has had, she has continued to allow Father into her life and to have regular contact with him, even when she knew that she might stand a better chance of having the Children returned to her without him in her life.

Not a reasonable excuse, but perhaps some of Mother's behavior can be explained by her use of K-2 and other illegal drugs. Unfortunately, even after a six-month inpatient treatment stint, Mother still maintained contact with Father, failed to acquire stable and appropriate housing, and failed to follow on-going treatment recommendations. The bright spot in the last two years is that Mother currently has full-time employment; however, the employment has a dark side in that Mother uses the employment as an excuse for not complying with court-ordered services.

Throughout BCCYS' involvement, Mother has had a less than perfect attendance record for counseling, casework, drug screens, and even visitation. She has not complied with mental health services. Mother has not internalized a need to modify her lifestyle or otherwise demonstrated an ability to provide for the Children's well-being or to keep them safe.

Just like Father, Mother has had over one year to remedy the circumstances that led to the removal and placement of the Children but has failed to do so or otherwise perform her parental duties. She has not fully availed herself of the services available to her and the continued provision of services to her does not appear to be reasonably likely to effect a meaningful change in her insight and behavior. Her inability or refusal to change her life choices has left the Children without essential parental care, control, and subsistence necessary for their physical, mental, and emotional well-being.

1925(a) Op. at 8-9.

Mother challenges the sufficiency of the evidence presented to establish termination. Mother's Br. at 23-24. Mother argues that BCCYS "failed to show that repeated and continued incapacity, abuse, neglect or refusal of the parent has caused [Children] to be without essential parental care, control or subsistence necessary for [their] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." *Id.* at 27. Mother maintains that there were no concerns that Children were being abused or neglected. *Id.* She points to the lack of any indication that Children were physically abused, a lack of problems or negative impact in school, and a lack a concern with the physical state and presentation of Children and the home. *Id.* at 27-28. Further, Mother highlights her journey to overcome

her substance abuse and acknowledges her lengthy treatment. *Id.* at 28. As a result, Mother indicates that she "achieved a significant period of sobriety" before BCCYS filed its petition. *Id.* Mother contends that BCCYS failed to establish incapacity and that she was unable to properly parent her children. *Id*. Rather, she posits that "[h]er capacity to parent the Children is evidenced by how loving, caring, and positive Mother's visits were with her daughters." *Id.* We disagree.

The record supports the trial court's termination of Mother's parental rights pursuant to Section 2511(a)(2). Children were removed from parental care on November 17, 2014, a period of approximately twenty-one months at the time of the termination hearing, due to issues of domestic violence and substance abuse. N.T., 8/12/16, at 57, 61-62, 66, 100, 107. Although Mother completed a six-month inpatient treatment program at Gaudenzia, Mother did not follow post-treatment recommendations. *Id.* at 82. Rather than attending aftercare in Lancaster County, Mother returned to Reading and attended counseling, which she did not complete, and from which she was unsuccessfully discharged. *Id.* at 82, 109-10. Mother also stopped presenting for urine screens. *Id.* at 85, 113-14. In addition, Mother failed to successfully complete domestic violence therapy on two separate occasions. *Id.* at 65, 81. Addressing her concerns at the time of Mother's unsuccessful discharge from treatment with her, Andrea Karlunas testified as follows:

I was concerned the domestic violence had been, affected her, that she was not ready or willing to leave that relationship, that she presented ambiguously about the relationship, wanting to be with him, not wanting to be with him. We have substance abuse involved, which inhibits her ability to parent the children. . . . It would hinder her ability to provide safety and parent her children. And also she might be using as a coping mechanism.

*Id.* at 38-39.

Critically, at times Mother evidenced a lack of insight and appreciation regarding both her substance abuse and the domestic violence and their impact on Children. *Id.* at 37-38, 40, 54-55, 68-69, 72-73. Explaining Mother's insight, Ms. Karlunas stated, "It was ambiguous. There were times she displayed really good insight. There [were] times she understood the gravity of the situation. And there were times when she became inconsistent and would minimize and would demonstrate a lack of insight into the [e]ffects the domestic violence had on her children or the effect of domestic violence on herself." *Id.* at 54-55. Even after speaking with Mother regarding the impact of domestic violence on Children, both with regard to their placement as well as emotionally and psychologically, as recounted by Ms. Karlunas, Mother admitted that she would "rather deal with [Father's] B.S. rather than struggling on her own." *Id.* at 71, 73. Notably, at the hearing, Mother acknowledged that she understood she and Father should not be together given the history of domestic violence. However, after indicating that she and Father are "very good friends" and at times engaged in a sexual relationship, she suggested, "[P]eople change.

Everybody makes mistakes and things. Everyone did things in their life that they regret, you know. You move forward and you know you forgive and forget. . . ." *Id.* at 170. Mother also modulated on her reports of domestic violence, maintaining she "exaggerated the truth" to obtain help. *Id.* at 171-72. Therefore, Ms. Karlunas suggested, "[N]either parent has resolved their domestic violence issues. If they cannot resolve their own issue, this cycle is going to continue and further traumatize these children." *Id.* at 36-37. BCCYS caseworker Nicole Kauffman-Jacoby echoed this prediction, stating, "There is a high likelihood the cycle will repeat and ongoing domestic violence will be possible and will affect [C]hildren." *Id.* at 85.

Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. *See id.*

We next determine whether termination was proper under Section 2511(b). With regard to Section 2511(b), we have stated as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b)

best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quotation marks and citations omitted) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)).

In determining that termination of Mother's parental rights favored Children's needs and welfare, the trial court concluded:

> The Children have a positive bond with their foster family. They feel safe in the foster environment. They wish to stay in that environment and do not want to return to Mother and Father and their family home. The Children do not feel safe with Mother and Father. To the extent a bond exists between the Children and Mother and Father, it is an unhealthy one at best. The Children suffered significant trauma caused by Mother and Father for which they continue to be in counseling. The Children deserve an opportunity to experience trauma-free life in a permanent, healthy, safe home where their rights to the fulfillment of their potential can be met.
>
> For the foregoing reasons, the Court concluded that termination of Mother and Father's parental rights to the Children was proper and in their best interests.

1925(a) Op. at 10.

Mother argues that the trial court erred and/or abused its discretion as the evidence failed to reveal that termination of her parental rights would best serve the needs and welfare of Children. Mother avers that the evidence suggests the maintenance of a strong bond between her and Children. Mother's Br. at 34-35. Mother points to displays and expressions of affection. *Id.* at 35. She argues that:

> These are not unhealthy emotions and bonds. The Children love their mother, and want to have more time with her. This mutual love and care that mother and children have shown for one another demand that the decision of the trial court be reversed.

*Id.* (citations to record omitted). While acknowledging that Children were exposed to trauma living with Mother and Father, Mother argues that she no longer resides with Father and Children could, therefore, be placed with her. *Id.* at 34-35. Further, although the foster home might be "better," Mother maintains she is "capable of exercising her parental duties." *Id.* at 36. We disagree.

The record supports the trial court's finding that terminating Mother's parental rights would best serve the needs and welfare of Children. When questioned about psychological damage to Children as a result of the domestic violence between their parents, Ms. Karlunas testified that Children "suffered some definite damage due to what they have been exposed to." *Id.* at 68. Children initially presented with negative behaviors, including avoidance, defiance and anger, as well as bed-wetting. *Id.* at 33-34, 87. I.G.H. also would not sleep by herself, and exhibited stuffed animal

- 16 -

attachment, fears regarding her future and whether her grandparents were going to die, and stress transitioning. *Id.* at 43-44, 87. However, Ms. Karlunas observed improvement in both children since placement. *Id.* at 46.

Additionally, although Children maintained a bond with and are "loving" toward Mother and are happy to see her at visitation, Ms. Karlunas reported anxiety post-visitation. *Id.* at 56-57, 91. Ms. Kauffman-Jacoby described Children's bond toward Mother as "protective." *Id.* at 91. Ms. Kauffman-Jacoby explained that Children are "loving toward mother;" however, they are "protective of mother, concerned about mother, worried about her." *Id.* Significantly, Ms. Karlunas stated that Children are "apt to talk more about their grandmother as their caregiver now versus mom as their caregiver." *Id.* at 56. Children "talk about their grandparents as their stable support givers." *Id.* at 57. As to I.G.H. and her grandparents, Ms. Karlunas indicated she was "very bonded and well[-]adjusted and building security." *Id.* at 45-46. Similarly, Ms. Kauffman-Jacoby noted a positive relationship between Children and their grandparents. *Id.* at 89. When asked to describe the interaction between Children and their grandparents, she testified, "They respond very well to their grandparents. They are easily redirected. They are very loving and affectionate with their grandparents. Every time I am there they given them hugs. They give them kisses. They look to them to meet their needs. If they ask for snacks, they get snacks. They are very receptive." *Id.* She further labeled the bond between them

as a "healty type bond." *Id.* Moreover, Children reported feeling unsafe with their parents and safe with their grandparents. *Id.* at 117-18, 128. As reported by Ms. Kauffman-Jacoby, "[Children] like living with their grandparents. We discussed safety. And they feel safe living with their grandparents, they feel stable there." *Id.* at 117.

Ms. Karlunas opined that "[C]hildren need[] a safe, stable environment to continue their progress" and "moving toward and proceeding toward permanency would help the children." *Id.* at 69. Further, Ms. Kauffman-Jacoby offered that "[b]ased on therapeutic recommendation reunification is not in the children's best interest." *Id.* at 118. She reported "no concerns" regarding the termination of parental rights as a detriment to Children. *Id.* at 92. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *R.J.S.,* 901 A.2d at 513.

Accordingly, based upon our review of the record, we find no abuse of discretion in the trial court's decision to terminate Mother's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

Lastly, we review Mother's evidentiary claim with regard to BCCYS' packet of 168 exhibits admitted by the trial court. Mother argues that exhibits presented were not appropriately authenticated to be admissible under the business records exception to the hearsay rule. Mother's Br. at

16-21. Moreover, Mother maintains that the trial court erred in admitting the case summary prepared by BCCYS and that many of the exhibits contained additional hearsay, including statements of diagnosis and opinion. *Id.* at 15, 21-22.

"Our standard of review relative to the admission of evidence is for an abuse of discretion." *Commonwealth v. Wantz*, 84 A.3d 324, 336 (Pa.Super. 2014); *see also In re Adoption of R.K.Y.*, 72 A.3d 669, 675 (Pa.Super. 2013).

Hearsay is an out-of-court statement offered for the truth of the matter asserted. Pa.R.E. 801. Unless the statement is not being offered for its truth or it falls within a hearsay exception, it is inadmissible. Pa.R.E. 802. As to the business records exception to the hearsay rule, Pa.R.E. 803(6) provides:

> (6) *Records of a Regularly Conducted Activity.* A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
>
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a

certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E)  the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

**See also** 42 Pa.C.S. § 6108(b).

An evidentiary error will be deemed harmless if:

(1) the error did not prejudice the defendant or the prejudice was *de minimus*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence . . . was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Commonwealth v. Markman**, 916 A.2d 586, 603 (Pa. 2007).  **See**

**Foflygen v. Allegheny General Hospital**, 723 A.2d 705, 708 (Pa.Super.)

("[Evidentiary] rulings must be shown to have been not only erroneous but

also harmful to the complaining part[y]."), *appeal denied*, 740 A.2d 233 (Pa.

1999).

The trial court admitted the BCCYS case file under the business

records exception, but made no determination as to whether the additional

hearsay statements contained within the file also qualified for an exception

to the hearsay rule.  Mother argues that this packet included a typed case

summary, which was inadmissible.  Mother, however, does not explain how

she was harmed by the summary's admission, particularly as the testimony

presented at the hearing provided sufficient support for the termination of

his parental rights. Similarly, to the extent the packet included additional hearsay statements, such as statements of diagnosis and opinion, Mother fails to identify how their admission caused her harm.

We, therefore, affirm the decrees terminating Father's parental rights.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/1/2017